**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

VIA CHRISTI REGIONAL MEDICAL
CENTER, INC.,

    Plaintiff,

       v.

SYLVIA M. BURWELL, Secretary,
Department of Health and Human Services,

    Defendant.

Civil Action No. 09-2060 (CKK)

**MEMORANDUM OPINION**
(January 28, 2015)

Plaintiff, Via Christi Regional Medical Center, Inc. ("Via Christi"), brings this action against Defendant Sylvia Matthews Burwell ("Secretary"), in her official capacity as Secretary of Health and Human Services,[1] to review the final decision of the Administrator for the Centers for Medicare and Medicaid Services ("CMMS") denying Plaintiff, as successor-in-interest to St. Francis Regional Medical Center, reimbursement under the Medicare program of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, for an alleged loss that Plaintiff incurred as part of the consolidation that resulted in Via Christi's formation. Specifically, Plaintiff seeks an order reversing and setting aside the final decision of the CMMS Administrator, and declaring that Plaintiff is entitled to $59,176,291 or such other amount of Medicare reimbursement determined to be due for the loss that St. Francis Regional Medical Center incurred on its consolidation. *See*

--------

[1] Pursuant to Fed. R. Civ. P. 25(d), Sylvia Matthews Burwell has been automatically substituted for Kathleen Sebelius, whom the parties' pleadings name as Defendant.

Compl. at 20, ECF No. [1].   Presently before the Court are the parties' cross-motions for summary judgment.   Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court GRANTS Defendant's [25] Motion for Summary Judgment and DENIES Plaintiff's [23] Motion for Summary Judgment.   Accordingly, judgment shall be entered for Defendant.

## I. BACKGROUND

### A.  Regulatory Framework

Title XVIII of the Social Security Act ("Medicare program"), 42 U.S.C. §§ 1395 *et seq.*, provides a system of federally funded health insurance for aged and disabled persons.   Relevant to the instant action, the statute permits providers of Medicare services to be reimbursed for "reasonable costs" of supplying such services.   42 U.S.C. § 1395f(b)(1).   Reasonable costs are

---

[2] This matter was stayed by the joint request of the parties on April 6, 2010, pending the United States Court of the Appeals for the District of Columbia Circuit's ruling in *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900 (D.C. Cir. 2010), and *Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534 (D.C. Cir. 2011).   The Court lifted the stay on September 9, 2011, after the D.C. Circuit issued in its opinion in both matters.   The Court denied a subsequent request to stay the proceedings pending resolution by the Supreme Court of the United States of the writ of certiorari filed in *Forsyth Mem. Hosp., Inc.*, and ordered briefing of the parties' dispositive motions.   The parties filed cross-motions for summary judgment.   Pl.'s Mot. for Summ. J., ECF No. [23] ("Pl.'s Mot."); Pl.'s Errata to Pl.'s Mot., ECF No. [34]; Def.'s Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summary Judgment, ECF No. [25] ("Def.'s Mot."); Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. and Def.'s Cross-Mot. for Summ. J., ECF No. [29] ("Pl.'s Reply"); Pl.'s Errata to Pl.'s Reply, ECF No. [35]; Def.'s Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. [31] ("Def.'s Reply").   Further, supplemental briefing was filed after the D.C. Circuit's ruling in *Pinnacle Health Hosps. v. Sebelius*, 681 F.3d 424 (D.C. Cir. 2012), and after other relevant opinions were issued, including the D.C. Circuit's ruling in *Catholic Healthcare West v. Sebelius*, 748 F.3d 351 (D.C. Cir. 2014) and *Central Iowa Hospital Corporation v. Sebelius*, 446 Fed. App'x 6 (D.C. Cir. 2012).   Pl.'s Notice of Supp. Auth., ECF No. [36]; Def.'s Notice of Updated Info., ECF No. [38]; Pl.'s Notice of Develop., ECF No. [40]. The motion is fully briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision.   *See* LCvR 7(f).

defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services," as determined in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A).  The Secretary has promulgated several regulations for determining "reasonable costs" under this section.

At the relevant time period, "reasonable costs" included capital-related costs, such as the costs related to the depreciation of buildings and equipment used for patient care under the Medicare program.  42 C.F.R. §§ 413.130(a) & 413.134(a) (1995).[3]  Such a depreciation was calculated based on the historical cost of the asset, *id.* at § 413.134(a)(2), defined as "the cost incurred by the present owner in acquiring the asset," *id.* at § 413.134(b)(1), and was prorated over the estimated useful life of the asset, *id.* at § 413.134(a)(3).  The regulation specifies:

> If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program.

42 C.F.R. § 413.134(f)(1).   The treatment of a gain or a loss under the Medicare program depends on the manner of disposition of the asset.  *Id.*   Pursuant to 42 C.F.R. § 413.134(f), gains and losses realized from the bona fide sale of depreciable assets are included in the determination of allowable costs.   *Id.* at § 413.134(f)(2)(i).   Accordingly, it is clear that the regulations contemplate that a provider may recover gains or losses realized as a result of disposing of assets through a bona fide sale.

---

[3] Unless otherwise specified, all citations to the Code of Federal Regulations reference the 1995 version that was in effect at the time of the consolidation at issue.

Also relevant to the instant action is 42 C.F.R. § 413.134(*l*) which addresses transactions involving a provider's capital stock.  Notably, the section addressing the consolidation of two providers, like the transaction at issue in the instant matter, is silent on the issue of whether an entity formed through a consolidation may recover gains or losses resulting from that transaction under the Medicare program.[4]  *See* 42 C.F.R. § 413.134(*l*)(3) (defining consolidations as "the combination of two or more corporations resulting in the creation of a new corporate entity").  In contrast, the section addressing statutory mergers between unrelated parties expressly provides that the merged corporation may recover for losses pursuant to 42 C.F.R. § 413.134(f), the section that provides for the recovery of losses for assets disposed of through a bona fide sale. 42 C.F.R. § 413.134(*l*)(2)(i).  Accordingly, it is clear from the regulatory scheme that an entity formed as the result of a statutory merger may recover losses if that merger was a bona fide sale. However, the regulatory scheme does not expressly provide that an entity formed through a consolidation may recover losses.

On October 19, 2000, CMMS's predecessor[5] issued Program Memorandum A-00-76 ("PM A-00-76") in order to "clarify" the application of 42 C.F.R. § 413.134(*l*) to mergers and consolidations involving non-profit providers.  A.R. at 1428 (Program Memorandum A-00-76). Specifically, PM A-00-76 was created because 42 C.F.R. § 413.134(*l*) was drafted to address mergers and consolidations involving for-profit providers.  *Id.*  As set forth in PM A-00-76, a gain or a loss adjustment for both merged and consolidated assets of non-profit providers is

---

[4] In 2000, section 413.134(*l*) was redesignated without change as 413.134(k).  *Pinnacle Health Hosps. v. Sebelius*, 681 F.3d 424, 426 n.1 (D.C. Cir. 2012).  However, the Court will refer to this provision as subsection (*l*) as it is appeared at the time of the consolidation.

[5] CMMS formerly was known as the Health Care Financing Administration ("HCFA").

recognized as long as the asset was disposed of through a bona fide sale as required pursuant to

42 C.F.R. § 413.134(f).[6]  *Id.* at 1429.  As explained in the PM A-00-76:

> [F]or Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining.

*Id.* at 1430.  In addition, PM A-00-76 indicated that in determining whether two parties are

related for the purposes of the Medicare regulations, "consideration must be given to whether the

composition of new board directors, or other governing body or management team, includes

significant representation from the previous board(s) or management team(s)." *Id.* at 1429.  The

parties dispute the applicability of PM A-00-76 to this action as discussed *infra*.

### B.     Factual and Procedural Background

The relevant facts in this case are undisputed.  Plaintiff's claim centers around the

October 1, 1995, consolidation of two entities, St. Francis Regional Medical Center and St.

Joseph Medical Center ("constituent hospitals"), that formed Plaintiff, Via Christi Regional

Medical Center.  Specifically, Plaintiff brings this suit as successor-in-interest to St. Francis

Regional Medical Center, alleging that it incurred a loss as a result of the consolidation and that

it is entitled to Medicare reimbursement as a result of that loss.  Plaintiff also sought to recover

---

[6] Pursuant to 42 C.F.R. § 413.134(f), recovery of a gain or loss for an asset disposed of through scrapping, demolition, abandonment, or involuntary conversion also is recognized. However, the only applicable provisions of 42 C.F.R. § 413.134(f) is the bona fide sale requirement because the assets in question were disposed of through a consolidation. Further, the Court notes that the bona fide sale requirement only applies to mergers or consolidations occurring before December 1, 1997, A.R. at 1428 (Program Memorandum A-00-76), making the requirement applicable to the instant consolidation that took effect on October 1, 1995, A.R. at 1712-13 (Stipulation, Apr. 23, 2007). The Medicare regulations were amended to eliminate the recognition of gains and losses for transactions finalized after December 1, 1997. A.R. at 1409-13 (63 Fed. Reg. 1379-83 (Jan. 9, 1998)).

losses as a result of this consolidation as successor-in-interest to St. Joseph. However, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") held that Plaintiff was not entitled to Medicare reimbursement for a depreciation adjustment in that matter. *See generally Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259 (10th Cir. 2007).

Prior to the consolidation, St. Francis Regional Medical Center ("St. Francis") was a hospital in Wichita, Kansas, that had a licensed bed capacity of approximately 880. A.R. at 740 (Testimony from PRRB hearing, Apr. 30, 2002). St. Francis was a nonprofit corporation under the laws of Kansas and its sole corporate member was St. Francis Ministry Corporation ("St. Francis Ministry"). *Id.* at 1712 (Stipulation, Apr. 23, 2007). The religious sponsor of both St. Francis and St. Francis Ministry was Sisters of the Sorrowful Mother – U.S. Health Systems, Inc. ("Sisters of Sorrowful Mothers"). *Id.* St. Joseph Medical Center ("St. Joseph") was an acute care hospital in Wichita licensed for 600 beds prior to the consolidation. *Id.* at 740 (Testimony from PRRB hearing, Apr. 30, 2002). St. Joseph also was a nonprofit corporation under the laws of Kansas and its sole corporate member was CSJ Health System of Wichita, Inc. ("CSJ"). *Id.* at 1712 (Stipulation, Apr. 23, 2007). The religious sponsor of both CSJ and St. Joseph was Sisters of St. Joseph of Wichita, Kansas ("Sisters of St. Joseph"). *Id.* Prior to the consolidation, there was no common ownership between St. Francis and St. Joseph, nor did the constituent hospitals have common officers or board members. *Id.* at 741 (Testimony from PRRB hearing, Apr. 30, 2002); *id.* at 1713 (Stipulation, Apr. 23, 2007).

The constituent hospitals entered into a consolidation that took effect on October 1, 1995, and was consummated pursuant to the Agreement of Consolidation and the Master Plan of Consolidation. *Id.* at 1712-13 (Stipulation, Apr. 23, 2007). Via Christi Regional Medical Center, Inc. ("Via Christi Medical Center") came into existence as a result of the consolidation

and both constituent hospitals ceased to exist.  *Id.* at 1713.  By virtue of the consolidation, good title to all of St. Francis' assets passed to Via Christi Medical Center and Via Christi Medical Center became legally responsible for all of St. Francis' liabilities.  *Id.* at 1712-13.

After the consolidation, Plaintiff, as successor-in-interest to St. Francis, sought Medicare reimbursement for an alleged loss it incurred as a result of the consolidation with St. Joseph.  *Id.* at 59-60 (PRRB Decision); *id.* at 1713-14 (Stipulation, Apr. 23, 2007).  On March 6, 1996, a letter was submitted to the fiscal intermediary ("Intermediary"), estimating the Medicare portion of St. Francis' loss at $35 million.  *Id.*  On March 31, 1997, an amended cost report was submitted to the Intermediary, reflecting that the Medicare portion of St. Francis' loss was approximately $58.5 million.  *Id.* at 1714.  Ultimately, the Intermediary disallowed Plaintiff's claim on the basis that the consolidation involved two related organizations and, accordingly, recovery under the Medicare program was not permitted.  *Id.*  Pursuant to 42 U.S.C. § 1395oo(a), Plaintiff appealed the Intermediary's denial of its request to the Provider Reimbursement Review Board ("PRRB").  The PRRB overturned the Intermediary's conclusion and found that St. Francis' loss should be recognized after determining that the constituent hospitals were unrelated prior to the consolidation.  *Id.* at 54-76 (PRRB Decision).  The PRRB rejected the Intermediary's argument that the consolidation was between related parties, and found that the constituent hospitals were unrelated parties as required for recovery under the regulation.  *Id.* at 66.  Further, the PRRB noted, relying on the appraised value of St. Francis' assets arrived at by employing the income approach, that the fair market value of St. Francis' assets approximated the consideration paid even though the correlation was "purely coincidental in the consolidation context."  *Id.* at 76.

The CMMS Administrator then exercised its discretion to review the final decision of the PRRB on behalf of the Secretary and found that Plaintiff was not entitled to recover for the loss on two grounds.  First, the Administrator concluded that there was a continuity of control between the constituent hospitals and Via Christi after the consolidation and, accordingly, the consolidation was one between related parties such that recovery for any loss was barred under the regulations.  *Id.* at 26-27 (CMMS Administrator Decision).  Second, the Administrator found that the transfer of assets in this case did not constitute a bone fide sale because the consolidation did not involve an arm's length transaction.  *Id.* at 27-30.  Further, the Administrator found that the consolidation was not a bona fide sale because a comparison of the net book value of St. Francis' assets to the consideration exchanged, i.e. St. Francis' liabilities that were assumed as part of the consolidation, did not support a finding that there was reasonable consideration exchanged for the consolidation.  *Id.* at 30-31.  As an alternative ground for finding that there was not reasonable consideration, the Administrator found that even relying on the appraised value of St. Francis' assets as calculated by the cost approach, there was too large of a discrepancy between the value of the assets and the consideration exchanged for the consolidation to meet the bona fide sale requirement. *Id.* at 31-33.  As a result, the Administrator found that recovery of a loss was not allowed under the regulations and Provider Reimbursement Manual.  *Id.* at 33-34.  The Administrator's decision became the final decision of the Secretary. Pursuant to 42 U.S.C. § 1395oo(f)(1), Plaintiff filed the instant action in this Court requesting judicial review of the Administrator's decision.  *See* Compl., ECF No. [1].

## II. LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

**B.  Medicare Disbursement Disputes**

The parties agree that 42 U.S.C. § 1395oo(f)(1) provides the applicable standard of review and incorporates the review standard of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*  *See* Pls.' Mot. at 12; Def.'s Mot. at 14-15.  Pursuant to the APA, the

reviewing court shall set aside the Secretary's findings if the findings "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E); *Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011). Further, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under the narrow "arbitrary and capricious" standard, a court may not substitute its own judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "In reviewing that explanation, '[the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1975)); *see also Cellco P'ship v. Fed. Commc'ns Comm'n*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (noting "arbitrary and capricious" review is "highly deferential . . . presum[ing] the validity of agency action . . . [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment"). Moreover, the Court "must affirm if a rational basis for the agency's decision exists." *Bolden v. Blue Cross & Blue Shield Assoc.*, 848 F.2d 201, 205 (D.C. Cir. 1988). The degree of deference a court should pay an agency's construction is, however, affected by "the thoroughness, validity, and consistency of an agency's reasoning." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981).

Courts must also "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). This deference is particularly appropriate in contexts that involve a complex and highly technical regulatory program, such as Medicare, which requires significant expertise and entails the exercise of judgment grounded in policy concerns. *Id.*; *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994) ("[I]n framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference which is due to the Secretary's decision."). Thus, a court does not have the "task . . . to decide which among several competing interpretations best serves the regulatory purpose," but instead, "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotations omitted).

### III. DISCUSSION

Plaintiff provides two bases for overturning the Secretary's final determination that Plaintiff as successor-in-interest to St. Francis was not permitted to recover losses suffered as a result of the consolidation with St. Joseph under the Medicare program. First, Plaintiff argues that the Secretary improperly required Plaintiff to show that the consolidation at issue was a bona fide sale in order for Plaintiff to recover Medicare reimbursement for St. Francis' losses resulting from the consolidation. In the alternative, Plaintiff argues that if it was required to show that the consolidation was a bona fide sale, the Secretary incorrectly found that Plaintiff did not meet this requirement. Second, Plaintiff argues that the Secretary incorrectly examined the continuity of control between St. Francis and St. Joseph, and the entity formed as a result of the consolidation, Via Christi, in determining whether the parties were "related" within the meaning of the

Medicare regulations.  As discussed herein, the Court finds that the Secretary properly found that Plaintiff is required to, and failed to demonstrate that the consolidation is a bona fide sale.  The Court does not reach the issue of whether the parties were "related" because it has determined that Plaintiff's claim fails on the basis that the consolidation was not a bona fide sale.

### A. Bona Fide Sale Requirement Applies to this Consolidation

The parties dispute whether Plaintiff is required to establish that the consolidation was a bona fide sale within the meaning of the Medicare regulations in order to recover losses. Plaintiff argues that language of the statute and related regulations does not impose the bona fide sale requirement on consolidations even though the requirement is imposed on mergers. Pl.'s Mot. at 12-13.  Specifically, Plaintiff argues that the Secretary should not have applied the "clarifications" of 42 C.F.R. § 413.134(*l*) as embodied in the PM A-00-76 to the instant action for a host of reasons.  *See* Pl.'s Mot. at 9-11.  However, Plaintiff's claim fails as it relates to application of the bona fide sale requirement to consolidations because binding precedent in this jurisdiction supports the Secretary's position on this issue.

In *Pinnacle Health Hospitals v. Sebelius*, 681 F.3d 424 (D.C. Cir. 2012), a case decided after this matter was fully briefed, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") held that the Secretary's application of the bona fide sale requirement as designated in PM A-00-76 to a 1995 consolidation of two non-profit hospitals was not plainly erroneous or inconsistent with the regulation.  *Id.* at 426.  Plaintiff brought D.C. Circuit's decision in *Pinnacle Health Hospitals v. Sebelius* to the Court's attention through the filing of a Notice of Supplemental Authority.  Pl.'s Notice of Supp. Auth., ECF No. [36].  In its opinion, the D.C. Circuit noted that, "[i]t would be a 'strange result, to say the least,' if consolidating providers did not have to satisfy the same bona fide sale requirement as merging

12

providers." *Pinnacle Health Hospitals*, 681 F.3d at 426.  Accordingly, the Court has determined that the Secretary's application of the bona fide sale requirement to this 1995 consolidation of two non-profit hospitals was proper.  However, Plaintiff asserts that the D.C. Circuit's decision is not dispositive in this matter because the Administrative Record in this case does not support the Secretary's determination that the consolidation in the instant matter did not meet the bona fide sale requirement.  Pl.'s Notice of Supp. Auth. at 1-2.  The Court now turns to this issue.

### B.  Substantial Evidence Supports the Secretary's Finding of No Bona Fide Sale

The Court must next determine whether, on the facts of this case, the Secretary's determination that Plaintiff is not eligible to recover losses because the consolidation was not a bona fide sale is unsupported by substantial evidence, or is otherwise arbitrary or capricious.  *See Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011).  Plaintiff bears the burden of demonstrating that the transaction was a bona fide sale.  *Id.* at 539.  "A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self-interest."  A.R. at 1417 (Provider Reimbursement Manual § 104.24 (May 2000)); *id.* at 1430 (PM A-00-76) (adopting this definition of a bona fide sale as applicable to consolidations involving non-profit entities prior to 1997).  The Secretary found that the consolidation at issue did not meet the bona fide sale requirement because the consolidation was not an arm's length transaction and there was not reasonable consideration for the transaction.  *Id.* at 27-34 (CMMS Administrator Decision).  The Court finds that substantial evidence supported the Secretary's determination that St. Francis' consolidation with St. Joseph was not a bona fide sale, and the Secretary's finding was not otherwise arbitrary or capricious for the reasons described herein.

13

First, the Secretary found that St. Francis failed to establish that its consolidation was an arm's length transaction. *Id.* at 27-28. Plaintiff argues that the consolidation at issue was an arm's length transaction because St. Francis and St. Joseph were unrelated prior to the consolidation. Pl.'s Mot. at 21-22. However, the Court finds several other factors relevant to its analysis as described herein. While Plaintiff properly points out that the D.C. Circuit has not expressly applied the arm's-length transaction requirement, *id.* at 21, because its decisions have rested on other grounds, the Tenth Circuit addressed the issue of whether St. Joseph engaged in arm's length bargaining when entering into the instant consolidation. *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1276 (10th Cir. 2007). Notably, the Tenth Circuit found substantial evidence supported the Secretary's determination that this was not an arm's length transaction because:

> St. Joseph admitted that it was not attempting to get the full value for its assets, but rather its primary goal was to make a decision that would advance its ministry. The principals of St. Joseph did not approach any other entity about a consolidation, and they rejected the idea of putting St. Joseph up for sale because of their desire to perpetuate Catholic health care ministry in the community.

*Id.* While this Court is tasked with determining whether St. Francis, rather than St. Joseph, engaged in an arm's length transaction, the Court is nonetheless persuaded by the Tenth Circuit's analysis because the same pertinent facts are present before the Court in the instant action.

The Administrative Record supports the Secretary's finding that St. Francis' decision to consolidate was not arm's length transaction. The Secretary found that the record lacks any evidence that St. Francis attempted to maximize its sale price. A.R. at 28 (CMMS Administrator Decision). Instead, as the Secretary noted, "[t]he record shows that [St. Francis'] strategy for consolidation focused on the formation of an entity that would advance their ministry, not

maximize the proceeds received from selling its assets." *Id.* at 28-29.   Indeed, the Secretary pointed to testimony that the decision to consolidate was made at the sponsor level rather than at the hospital level. *Id.* at 29.   Further, the Secretary noted that St. Francis' transferred assets were not appraised until almost 27 months after the consolidation was complete. *Id.* at 28.   The Secretary found that "[t]he absence of a calculation and determination of the value of [St. Francis'] assets by [St. Francis] before commencement of the transaction in order to ensure that such assets were transferred to St. Joseph for reasonable consideration, is also strong indication that this transaction did not involve a bona fide sale." *Id.* at 29.   For the foregoing reasons, the Court finds that there was substantial evidence to support the Secretary's finding that St. Francis was not involved in a consolidation that involved bargaining at arms' length between well-informed parties, each acting in its own self interest. *Id.* at 29-30.

Second, the Secretary found that St. Francis did not receive reasonable consideration for the transaction. *Id.* at 30-34.   "Reasonable consideration" reflects the fair market value of the assets transferred. *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 905 (D.C. Cir. 2010).   Indeed, "a 'large disparity' between the assets' purchase price and their fair market value indicates the underlying transaction is not in fact bona fide." *Id.*   To determine whether there has been reasonable consideration, the Court must examine the difference between the consideration given, namely St. Francis' transferred liabilities, and the fair market value of St. Francis' transferred assets because no other consideration appears to have been exchanged in this transaction.[7]   While D.C. Circuit has not adopted a sharp rule on the size of the disparity between

_____

[7] Plaintiff contends that it also incurred liabilities that were unknown at the time of the consolidation and, accordingly, those risks should have been deemed "consideration" and given weight by the Secretary.  Pl.'s Mot. at 20-21.  Here, Plaintiff has pointed to some testimony in

value and consideration relevant to determining whether a bona fide sale has occurred, it has noted that Plaintiff bears the burden of proving a bona fide sale. *See Catholic Healthcare West v. Sebelius*, 748 F.3d 351, 355 (D.C. Cir. 2014).  Here, Plaintiff contends that the Secretary failed to use a proper method for determining the fair market value of St. Francis' assets and, because of this error, incorrectly concluded that reasonable consideration was not exchanged.

The Secretary chose to rely on the total book value of St. Francis' assets, noting that this was the most accurate indicator of the assets' value at the time of the transaction because St. Francis had not appraised its assets at the time of the consolidation. *Id.* at 30 (CMMS Administrator Decision).  Based on St. Francis' working papers, the Secretary determined that St. Francis transferred a total of $369,964,118 in assets.  *Id.*; *see also id.* at 225 (Balance Sheet). As the Secretary noted, this total included:

- $116,577,387 in current and cash assets
- $148,044,951 in plant and property equipment
- $18,918,981 in deferred financing costs
- $7,418,270 of funds held in trust
- $79,004,529 in Board designated funds

---

the Administrative Record that there were unknown liabilities that could not have been uncovered through due diligence, and that there was one fraud claim brought against St. Francis after the consolidation that settled in excess of $3 million.  A.R. at 330-31 (Testimony from PRRB hearing, Apr. 25, 2007).  The Court finds Plaintiff's argument on this issue unpersuasive as all Plaintiff has pointed to is evidence of the mere assumption of unspecified risks undertaken as a result of this transaction, and has not proposed any way that this "consideration" should be quantified for purposes of this analysis.  *See Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011) (noting that the provider bears the burden of demonstrating that the transaction was a bona fide sale).  Further, the Court notes that St. Francis was required to indicate as of the date of the agreement that it had listed all material liabilities on its financial statements and Plaintiff has not referenced that any such liabilities were listed.  A.R. at 420 (Master Plan of Consolidation).  The Tenth Circuit also rejected this claim as it related to St. Joseph.  *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1277 n.16 (10th Cir. 2007).

*Id.* at 30-31; *see also id.* at 225.  Further, the Secretary found that St. Francis also transferred $214,641,617 in liabilities.  *Id.* at 31; *see also id.* at 225; *id.* at 212 (Loss Computation).  The Secretary noted the significant difference between the transferred assets ($369,964,118) and the transferred liabilities ($214,641,617).  *Id.* at 31.  The Secretary ultimately found that "[t]his significant difference between the 'sale' price and the only contemporaneously determined valuation of assets at the time of the transaction does not constitute reasonable consideration." *Id.*

Plaintiff objects to the Secretary's use of the book value of its assets, arguing that this amount differs from the fair market value of the assets.  Instead, Plaintiff contends that the Secretary should have adopted the valuation performed by Valuation Counselors using the income approach.  Pl.'s Mot. at 16; Pl.'s Reply at 15-16.  Plaintiff provided an appraisal of St. Francis' assets as of September 30, 1995, A.R. at 1048-81 (Appraisal of St. Francis), indicating that the fair market value of St. Francis' nonoperating investments and other assets was $219,000,000 at the time of the consolidation, *id.* at 1050.  Plaintiff argues that using this figure, it is clear that St. Francis received reasonable consideration during the transaction because there was not a large disparity between the fair market value of its assets ($219,000,000) and its transferred liabilities ($214,641,617).  Pl.'s Mot at 16; Pl.'s Reply at 15-16.

The Secretary in her final decision addressed the appraisal conducted by the Valuation Counselors even though she did not expressly accept the appraisal because it was not completed contemporaneously with the consolidation.  A.R. at 31-32 (CMMS Administrator Decision).  Indeed, the Secretary opined that the 27-month lag between the consolidation and the evaluation of the value of St. Francis' assets called into question the validity of the appraisal.  *Id.* at 29. Nonetheless, the Secretary rejected use of the valuation prepared using the income approach and

instead discussed the valuation submitted using the cost approach. *Id.* at 31. Specifically, the Secretary noted that if it combined the depreciated reproduction value of the medical center facilities (land, land improvements, building, and equipment) as determined through the cost approach in the appraisal ($134,820,780), *id.* at 32; *id.* at 1167 (Appraisal of St. Francis), with the figures for the current and cash assets ($116,577,387), and the board designated funds ($83,937,713), *id.* at 33; *id.* at 1029 (Balance Sheet), St. Francis' assets still totaled more than $100 million in excess of St. Francis' liabilities. Accordingly, the Secretary found this analysis further supported the finding that reasonable consideration was not exchanged during this transaction. *Id.* at 33.

The issue before the Court is whether there is substantial evidence to support the Secretary's finding that St. Francis did not receive reasonable consideration in exchange for consolidating with St. Joseph. Specifically, the Secretary relied on the net book value of the assets to determine that there was not reasonable consideration after questioning the validity of the appraisal that was completed over two years after the consolidation. Further, the Secretary determined that even applying the valuation arrived at through the cost approach from the post-merger appraisal, St. Francis still had not demonstrated that it received reasonable consideration for the consolidation.

Turning first to the Secretary's consideration of the net book value of St. Francis' assets, the D.C. Circuit has recognized that the Secretary may consider the net book value of assets even if a provider offers an appraised value. *C.f. Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534, 539 (D.C. Cir. 2011), *cert. denied* 132 S. Ct. 1107 (2012) (finding no error when the Secretary considered the net book value of the provider's land and depreciable assets, along with appraised value); *see also Whidden Mem. Hosp. v. Sebelius*, 828 F. Supp. 2d 218, 226-27 (D.D.C. 2011)

(finding that the Secretary properly considered both the net book value of the property, plant, and equipment as well as the appraised value of the property in making its determination).  The Court finds that the Secretary did not err in considering the net book value of assets in her analysis of the reasonable consideration issue, particularly in light of the fact that the appraisal was not available to parties at the time of the consolidation and the Secretary in her analysis also specifically considered the appraised values.  Here, it was reasonable for the Secretary to consider that there was over a $155 million difference between the net book value of St. Francis' assets and its liabilities at the time of the consolidation.

Turning next to Secretary's treatment of the appraised values of St. Francis' assets, the Secretary's reliance on the cost approach, rather than the income approach, is endorsed by the language of PM A-00-76.  A.R. at 31-32.  As explained in the PM A-00-76, "[t]he cost approach is the only methodology that produces a discrete indication of the value for the individual assets of the business, and thus, is the approach that is used to allocate a lump sum sales price among the assets sold."  *Id.* at 1431 (PM A-00-76).  On the other hand, "[t]he income approach produces a valuation through analysis of the predicted future stream of income."  *Id.*  In relevant part, PM A-00-76 provides the following explanation in support of applying the cost approach over the income approach to consolidations like the one at issue in this case:

> [T]he income approach produce[s] a valuation of the business enterprise as a whole, without regard to the individual fair market values of the constituent assets. As a result, . . . the income approach could produce an entity valuation that is less than the market value of the current assets. Moreover, the income approach has minimal application in the non-profit sector because 1) earnings are often understated due to charity care, pricing limitations, and government regulations, and 2) the approach uses complex formulae that include some factors that are of questionable use in valuing non-profit entities (e.g., common stock risk premium). For the foregoing reasons, the cost approach is the most appropriate methodology to be used in establishing the fair market value of the assets sold for the purpose of comparison with the sales price in a *bona fide* sale analysis.

19

*Id.*  The D.C. Circuit has expressly left open the question of whether PM A-00-76 provides an adequate basis for excluding the application of the income approach to the reasonable consideration analysis of a transaction involving non-profit entities.  *Catholic Healthcare West v. Sebelius*, 748 F.3d 351, 354 (D.C. Cir. 2014), *reh'g en banc denied* No. 13-5090 (D.C. Cir. Jun. 5, 2014).  However, other courts have accepted application of the cost approach to mergers and consolidations between non-profit entities as expressed in PM A-00-76.  *Jeanes Hosp. v. Sec'y of HHS*, 448 Fed. App'x 202, 208 (3d Cir. 2011) (deferring to the Secretary's use of the reproduction-cost approach over the income approach for assessing a merging entity's assets); *New Eng. Deaconess Hosp. v. Sebelius*, 942 F. Supp. 2d 56, 67 (D.D.C. 2013) (holding based on the D.C. Circuit's acceptance of the application of PM A-00-76 in other contexts, that "it was reasonable for the Secretary to use the cost approach in determining what portion of the sales price was to be allocated to the plaintiff's depreciable assets in deciding whether the plaintiff received 'reasonable consideration' for those assets").   The Court finds that based on the facts of this case, the Secretary's reliance on the cost approach valuation instead of the income approach valuation was supported by substantial evidence and was not arbitrary or capricious.

Here, the Secretary indicated that the reproduction cost approach was useful to determine the fair market value of depreciable assets because the approach is the only methodology that assigns a value to each individual asset.  A.R. at 31 (CMMS Administrator Decision).  The Secretary went on to explain that the income approach was not useful because it "relies upon an analysis of the predicted future income of the business enterprise as a whole without any regard to the individual and inherent value of the depreciable assets."  *Id.*  Plaintiff argues that "[t]he Secretary has not offered a reasonable basis for the Administrator to have rejected the Income

Approach valuation relied on by the PRRB and to have used instead the Cost Approach."[8]  Pl.'s Reply at 16.  However, the Secretary in its final decision specifically raised concerns about the appraiser's application of the income approach to reach $219,000,000 value of St. Francis' assets relied on by Plaintiff in this case.  A.R. at 32 n.51 & n.52.  The Secretary noted that the income approach was applied using the figure of $5 million for annual revenue for St. Francis despite the fact that St. Francis' revenue was $15 million in 1994 and $24.8 million in 1995.  *Id.* at 32 n.51. While St. Francis argued that this figure was correct, even with the aid of hindsight, the Secretary noted that drop in St. Francis' revenue coincided with the consolidation and may raise doubts as to the initial success of the consolidation.  *Id.*  Moreover, the Secretary noted "the swings [in revenue] demonstrate the difficulties of valuing a business based on predicted future income."  *Id.*  Further, the Secretary also noted that in the income approach appraisal, the net working capital total appeared to already have been reduced by liabilities that made up the consideration for the transaction.  *Id.* at 32 n.52.  For these reasons, the Court concludes that the Secretary provided a reasonable basis for using the book value and the appraised value for the assets arrived at through the cost approach in her analysis.  Further, the Court finds that there is substantial evidence in the record to support the Secretary's finding that St. Francis did not receive reasonable consideration for the transaction in light of the significant disparity between the consideration exchanged and the fair market value of St. Francis' assets.

Finally, the Court notes that Plaintiff in its Reply specifically indicates that the Secretary's calculation of its assets utilizing the cost approach is too high.  Pl.'s Reply at 16.  In

---

[8] Despite Plaintiff's reliance on the figure for St. Francis' assets used by the PRRB, Plaintiff in its Reply relies on the $214,641,617 figure for St. Francis' liabilities, Pl.'s Reply at 15-16, even though the PRRB found that the total liabilities assumed were $212 million.  A.R. at 76 (PRRB Decision).

particular, Plaintiff asserts that St. Francis' board-designated funds were actually worth less than $84 million, the value used by the Secretary in its analysis, and references the United States Court of Appeals for the Third Circuit's opinion in *UPMC-Braddock Hosp. v. Sebelius*, 592 F.3d 427 (3d Cir. 2010), in support of this argument.  In *UPMC-Braddock Hosp. v. Sebelius*, the Third Circuit remanded the case to the District Court in part so that the District Court would more closely examine whether the figure used for current/cash assets by the Secretary was correct when the figure included accounts receivable and other assets that may not have been available for immediate use.  *Id.* at 433-34.  Here, Plaintiff, who bears the burden of establishing that the transaction was a bona fide sale, does not offer any alternative for how the Secretary should have calculated this figure, nor does it specify which amounts it believes should have been excluded from the figure.  *See* Pl.'s Reply at 16.  Instead, Plaintiff relies on its argument that the Secretary should have used the values for the assets arrived at through the income approach, and not the cost approach without providing an analysis of the assets.  Accordingly, the Court shall not conduct a more searching examination of the figures used by the Secretary in her application of the cost approach as Plaintiff has not made a record on which the Court can rule.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's [25] Motion for Summary Judgment and DENIES Plaintiff's [23] Motion for Summary Judgment.  The Court finds that substantial evidence supports the Secretary's finding that Plaintiff as successor-in-interest to St. Francis is barred from recovery of the claimed loss incurred during its consolidation with St. Joseph under the Medicare regulations because Plaintiff has failed to establish that the transaction at issue was a bona fide sale.  The Court further finds that the Secretary's finding that St. Francis failed to satisfy the bona fide sale requirement is not otherwise arbitrary or

capricious.  Accordingly, judgment shall be entered for Defendant.  Further, the Court does not reach the issue of whether the consolidation at issue was between related or unrelated parties because it bases its opinion on Plaintiff's failure to satisfy the bona fide sale requirement.  An appropriate Order accompanies this Memorandum Opinion.


Dated:  January 28, 2015


                              _____/s/_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge